Filed 6/16/15  P. v. Vo CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LARRY VO,<br><br>    Defendant and Appellant. | 2d Crim. No. B256343<br>(Super. Ct. No. NA083407)<br>(Los Angeles County) |

An information charged appellant Larry Vo with stalking.  (Pen. Code, § 646.9, subd. (a).)[1]  The trial court found him incompetent to stand trial and committed him to the care of a state hospital, from which he was released after three years.  The People then amended the information to add a charge of sexual battery.  (§ 243.4, subd. (a).)  The trial court resumed the proceedings, finding appellant competent to stand trial on the basis that he pled guilty to a misdemeanor charge in an unrelated case five months earlier.  Following a bench trial, appellant was convicted of stalking and acquitted of sexual battery.  The trial court sentenced him to a term of three years in jail with credit for three years of presentence custody.

Appellant contends that the trial court erred by finding him competent and that there is insufficient evidence of his intent to induce fear in the victim.  We conclude

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

that the competency finding is not supported by substantial evidence. Therefore, we conditionally reverse the judgment and remand with directions to (1) hold a retrospective competency hearing, if possible; (2) retry appellant, if he is currently competent; or (3) dismiss the charges.

## FACTS

Victim Hong V. was heading from Westminster to St. Mary Medical Center in Long Beach, where she worked. She and appellant, whom she did not know, were waiting at a bus stop. Appellant asked her in Vietnamese for a dollar. She did not want him to know that she understood the language, so she ignored him.

They both boarded a bus. Appellant sat very close to the victim in a row in front of her. Appellant made her feel uneasy. In her view, he was "not a good person" because "he was young and he asked for money as a beggar." Appellant "talk[ed] a lot" to the victim, asking her questions such as her name and where she was living, but she did not respond.

The victim exited the bus at the Veterans Administration Hospital so that she could study at the library at California State University Long Beach (CSULB) before work. Appellant followed her off the bus. While the victim was waiting for a connecting bus, appellant stood directly behind her. She told him not to follow her or she would call the police. Appellant did not leave.

When the connecting bus arrived, the victim boarded it and appellant followed, sitting three or four feet away from her, which made her feel scared. He looked at her "[o]nce in awhile." She got off at the CSULB library, trailed by appellant. She told him, "You are the same age [as] my kid. I don't want you to follow me." She again told him that she would call the police if he continued.

Appellant told the victim that he did not care about her age. He asked her whether she was married. She told him that she was. He told her that she was nice and that he wanted to be friends with her, which she interpreted as "loving words to attract" and "tempt" her. She hated him for speaking to her like that.

2

The victim decided to go to the cafeteria rather than the library, where she would have to sign in using her name, because she did not want appellant to know who she was. When the victim sat down at an empty table to eat her lunch, appellant sat down in the seat next to her. He asked her if she wanted a bottle of water. She said no. He bought a bottle of water and placed it in front of her.

The victim continued eating her lunch, ignoring appellant, who was talking to her. She felt scared that he might harm her because he continued to pursue her even after she refused all of his advances. However, he did not say or do anything that specifically made her afraid, and at that point she did not fear that he would physically harm her.

Eventually, the victim got up and went into the nearby women's restroom. Appellant followed her inside, laughing. She was so scared that she called out for help, but the restroom door was closed. Appellant grabbed her shoulders from behind and turned her around to face him. Holding her tightly in his arms, he kissed her all over her face, neck, upper chest, and shoulders. She escaped through the door and again called out for help. People working in the building called the police. Appellant walked away, and the police arrested him.

PROCEDURAL BACKGROUND

Appellant was arraigned on the stalking charge and pled not guilty. During a subsequent readiness hearing, the trial court stated that it had a doubt as to appellant's competency to stand trial. It appointed two mental health experts, Drs. Gordon Plotkin and Ronald Fairbanks, to examine appellant. Both experts opined that appellant was incompetent to stand trial. Dr. Plotkin concluded that appellant was suffering from psychosis. Dr. Fairbanks found that appellant had a "distorted perception of reality" and "suspected an intellectual delay."[2] Further evaluation of his intellectual capacity was recommended to rule out mental retardation. After a competency hearing, the trial court agreed with the expert opinions that appellant was incompetent. It suspended the

---

[2] These reports are not in the appellate record. Their findings are summarized in the May 1, 2012, report by Dr. Merle Madera.

3

criminal proceedings and committed appellant to the care of the Department of Mental Health (Department) for treatment until such time as his competency was restored.

The Department, in its initial report and subsequent progress reports, recommended that appellant remain in its custody for treatment. The trial court adopted these recommendations. More than two years after the trial court found appellant incompetent, Dr. Merle Madera, a psychiatrist at Patton State Hospital (Patton), reported that, notwithstanding appellant's "constantly expressed . . . desire to go back to court," "there is no substantial likelihood that [he] will achieve trial competence in the foreseeable future." Pursuant to Dr. Madera's recommendation, the trial court initiated conservatorship proceedings.

The Office of the Public Guardian (Public Guardian) declined to establish a conservatorship, finding that appellant did not meet the criteria for being "gravely disabled."[3] Although accepting the state hospital's conclusions that appellant suffered from mental retardation and remained incompetent to stand trial, the Public Guardian found that he did not qualify for a conservatorship because he did not have a mental health *disorder.* (See Welf. & Inst. Code, § 5008, subd. (h)(3) ["The term 'gravely disabled' does not include persons with intellectual disabilities by reason of that disability alone"].)

In a supplemental report to the court, Patton psychiatrist Dr. Mubashir Farooqi also found "that there is no substantial likelihood that [appellant] will achieve trial competence in the foreseeable future." He was "very concerned" about the Public Guardian's refusal to establish a conservatorship. He reiterated his team's view that appellant "is unable to provide food, clothing and shelter for himself by reason of his mental retardation and medical condition." His team changed its opinion regarding

---

[3] A criminal defendant who has been found incompetent to stand trial is "gravely disabled" if "(i) The indictment or information pending against the person at the time of commitment charges a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person[;] [¶] (ii) The indictment or information has not been dismissed[; and] [¶] (iii) As a result of a mental health disorder, the person is unable to understand the nature and purpose of the proceedings taken against him or her and to assist counsel in the conduct of his or her defense in a rational manner." (Welf. & Inst. Code, § 5008, subd. (h)(1)(B).)

appellant's dangerousness, finding that appellant did in fact present "a substantial danger of physical harm to others by reason of his mental disorder." Dr. Farooqi cited an incident in which appellant told a social worker, "you are very beautiful," and with his hands straight out walked towards her making kissing noises.

The head deputy of the Long Beach district attorney's office wrote to the Public Guardian, asking it to reconsider its decision not to recommend appellant for a conservatorship. The head deputy explained that even if appellant's mental retardation and medical condition (uncontrolled hyperthyroidism) do not by themselves qualify appellant for a conservatorship, "his medical condition has also resulted in Anxiety Disorder and Mood Disorder, which do make him eligible."

The Public Guardian continued to refuse to pursue a conservatorship for appellant. A week later, Patton notified the trial court that appellant had not regained competency after three years of commitment and, having no further legal hold on him, it was returning him to the court for final disposition. The court ordered him to be released from custody. Several months later, Dr. Plotkin, by order of the court, submitted a report finding that appellant was still incompetent to stand trial.

Nine months later, the trial court held a hearing on appellant's competency. At that time, the People amended the information to add the sexual battery charge. The trial court found appellant competent, and the proceedings against him resumed.

DISCUSSION

Due process prohibits the state from trying or convicting a mentally incompetent criminal defendant. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 464.) A defendant is presumed competent to stand trial. (§ 1369, subd. (f).) This presumption can be rebutted upon a showing that, "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§§ 1367, 1369, subd. (f).) We review a trial court's competency determination for substantial evidence, "viewing the evidence in the light most favorable to that determination." (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1513-1514.) Purely legal questions, such as the

5

conclusiveness of another court's competency finding in the present case, are reviewed de novo. (*People v. Rells* (2000) 22 Cal.4th 860, 870.)

Once a criminal defendant is found incompetent to stand trial, he must be committed to the care of an appropriate treatment facility or, in some circumstances, afforded outpatient status,[4] with the goal of restoring his competency. (§ 1370, subd. (a)(1)(B).) If he has a developmental disability,[5] the treatment process is governed by section 1370.1, which largely parallels section 1370 but differs in some important respects.[6]

In the general case where the defendant is not developmentally disabled, the medical director of the treatment facility must report to the court within 90 days "concerning the defendant's progress toward recovery of mental competence." (§ 1370, subd. (b)(1).) If "the report discloses a substantial likelihood that the defendant will regain mental competence in the foreseeable future," the defendant remains where he is. (*Ibid.*) Thereafter, written progress reports are due every six months. (*Ibid.*) If at any time the defendant is believed to have regained competence, the medical director of the treatment facility must file a certificate of restoration to competence with the court and return the defendant within 10 days for a competency determination. (§§ 1370, subd. (a)(1)(C), 1372, subd. (a).) If a report "indicates that there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future," the defendant also must be returned within 10 days so that the court can determine whether he is

---

[4] We do not discuss the procedure for defendants placed in outpatient status, which is similar to that for defendants in treatment facilities except for the persons responsible for monitoring and reporting their progress.

[5] A "developmental disability" is "a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely and constitutes a substantial handicap for the individual." (§ 1370.1, subd. (a)(1)(H).) The term includes intellectual disability, cerebral palsy, epilepsy, autism, and closely related conditions that are not solely physical in nature. (*Ibid.*; accord, Welf. & Inst. Code, § 4512, subd. (a).)

[6] One notable difference is that in certain circumstances section 1370 authorizes the involuntary administration of antipsychotic medication. (§ 1370, subds. (a)(2)(B)-(D).)

6

"gravely disabled" and, if so, initiate conservatorship proceedings for him. (§ 1370, subds. (b)(1)(A), (c)(2).)

In the case of developmentally disabled defendants, the executive director of the developmental facility similarly must report to the court within 90 days "concerning the defendant's progress toward becoming mentally competent." (§ 1370.1, subd. (b)(1).) If "the report discloses a substantial likelihood the defendant will become mentally competent within the next 90 days, the court may order that the defendant shall remain [where he is] for that period of time," though unlike with other defendants, this is discretionary with developmentally disabled defendants. (*Ibid.*) Only one subsequent progress report is required, due within 150 days of admission. (*Ibid.*) If at any time the defendant is believed to have become competent, the executive director of the developmental facility must notify the court and return the defendant for a competency determination.[7] (*Id*. at subds. (a)(1)(C), (b)(1).) If the progress report "indicates that there is no substantial likelihood that the defendant [will] become mentally competent," the defendant also must be returned to the court for proceedings to determine whether long-term commitment and detention is warranted.[8] (*Id*. at subds. (b)(1), (c)(2).)

---

[7] The statute provides that "if the defendant becomes mentally competent," the relevant official shall report to the court regarding his progress toward becoming mentally competent. (§ 1370.1, subd. (b)(1).) Presumably, this means if the defendant *is believed to have become* mentally competent, since only the trial court has the power to make a legally conclusive determination regarding competency. The statute further provides that "[u]pon becoming competent, the court shall order that the defendant be returned to the committing court." (§ 1370.1, subd. (a)(1)(C).) We presume this also refers to the developmental facility's belief that the defendant has become competent rather than the trial court's competency. We are not the first court to note the drafting problems in this statute and to ignore its literal language in favor of the Legislature's obvious intent. (See *In re Williams* (2014) 228 Cal.App.4th 989, 1002, fn. 7.)

[8] The statute requires the return of the defendant if there is no substantial likelihood that he "has" become mentally competent. To explain why this is a drafting error, some context is necessary. Originally, the statute provided for a maximum term of commitment of three years. In 1992, subdivision (c)(1) was rewritten to reduce the maximum term of commitment from three years to six months. As part of this change, subdivision (b)(1) was also rewritten. It originally provided for progress reports every six months but was changed to provide for a single progress report within 150 days of the commitment. In addition, the phrase "no substantial likelihood that the defendant will become mentally competent in the foreseeable future" was changed to "no substantial likelihood that the defendant has become mentally competent." Then, in 1996, the Legislature once again rewrote the statute, restoring the maximum term of commitment

In all cases of incompetency, the defendant must be returned to the trial court after 18 months of commitment for another competency hearing "held pursuant to the procedures set forth in Section 1369."**9**  (§ 1370, subd. (b)(4); accord, § 1370.1, subd. (b)(2).)  If the defendant does not recover competency, he remains at the treatment or developmental facility until "the end of"—meaning "no later than 90 days prior to the expiration of"—his "term of commitment."  (§ 1370, subd. (c)(1); accord, § 1370.1, subd. (c)(1)(A).)  The "term of commitment" is the lesser of three years or "the maximum term of imprisonment provided by law for the most serious offense charged."  (§ 1370, subd. (c)(1); accord, § 1370.1, subd. (c)(1)(A).)

Here, prior to the trial court's commitment order, there was evidence that appellant was developmentally disabled.  A court-appointed expert recommended that appellant be further evaluated in this respect.  It appears the trial court did not do so.  It should have.  (See § 1369, subd. (a) ["If it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled . . . to examine [him]"].)  Such an evaluation assists the trial court in selecting an appropriate place to confine the defendant and, if found incompetent, to commit him.  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1389.)  In addition, it "ensure[s] that a developmentally disabled defendant's competence to stand trial is assessed by those having expertise with such disability."  (*Ibid.*)  Given the trial court's ultimate finding that appellant was incompetent, however, the error was harmless.  (See *id.* at pp. 1389-1390.)

---

to three years.  It failed, however, to restore the language in subsection (b)(1), which no longer makes sense.

**9** "Penal Code section 1369 sets forth the procedures for the trial in which the question of the mental competence of the defendant is to be determined.  It provides that such a trial may be 'by court or jury' ([§] 1369), and that, if by jury, it must be decided by unanimous verdict ([§] 1369, subd. (f)).  It also provides for the appointment by the court of one or more experts to examine the defendant ([§] 1369, subd. (a)), the introduction of evidence by the defendant and the People ([§] 1369, subds. (b), (c) & (d)), and the presentation of argument by each thereafter ([§] 1369, subd. (e)).  It states that '[i]t shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent.' ([§] 1369, subd. (f).)" (*People v. Rells*, *supra*, 22 Cal.4th at p. 866.)

More problematic is the trial court's finding that appellant was competent to stand trial after his three-year commitment to Patton. At the hearing, the trial court considered Dr. Plotkin's most recent report concluding that appellant remained incompetent. In addition, the court considered three pieces of evidence from an unrelated case in which five months earlier appellant had pled guilty to a misdemeanor charge of public urination (Long Beach Mun. Code, § 9.25.010): a minute order, a *Tahl* waiver,[10] and a motion to withdraw his guilty plea. Four months after this plea (i.e., one month before the hearing on appellant's restoration of competency in the instant case), defense counsel in the public urination case moved to withdraw the plea on the ground that appellant was incompetent. The motion was denied. On that basis, the trial court in the instant case found appellant competent.

It is not clear whether the trial court in the public urination case expressly found that appellant was competent or whether it simply denied the motion to withdraw the guilty plea because there was no evidence of appellant's incompetency at the time the plea was entered. (See *People v. Day* (1988) 201 Cal.App.3d 112, 120 ["Section 1368 does not provide for a retroactive determination of a defendant's competence"]; see also *People v. Smith* (2003) 110 Cal.App.4th 492, 505 [trial court's incompetency finding normally does not "reach[] back to some unknown and unidentified point in earlier proceedings"].) That record is not before us. Even if the earlier court made a competency finding, it was not conclusive at a later time in an altogether different case. (Cf. *Bayramoglu v. Superior Court* (1981) 124 Cal.App.3d 718, 728 ["[A]n adjudication that a defendant *is* competent at one point in his prosecution (i.e., at one 'point in time') does not establish that he *was* competent at another"].) Therefore, the trial court erred in ruling that, "based on [the earlier ruling], I do have to find that [appellant] is competent."

Not only did the trial court err by deeming the earlier ruling conclusive, it erred by considering the ruling itself rather than the expert opinion and other evidence, if any, underlying it. (See *In re John Z.* (2014) 223 Cal.App.4th 1046, 1058 ["What was

---

**10** (*In re Tahl* (1969) 1 Cal.3d 122.)

missing, if the court indeed made a competency determination, was what [section 1369] clearly intend[s] to be the center of such a determination—the reports and/or testimony of experts who have evaluated the defendant for legal competency"].)  The opinion of retained experts is "ordinarily the most credible and persuasive 'evidence' as to th[e] issue" of competence.  (*Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 490.) "The centrality of expert reports is demonstrated by the rule that a formal adversary hearing on the issue of competence is not required if the prosecutor and defense counsel stipulate that the competency determination be made by the court based on the written reports of the court-appointed experts."  (*John Z.*, *supra*, at p. 1058.)

A trial court's earlier determination of the defendant's competence, when used for its evidentiary value in a later proceeding, is no different than any other expert conclusion.  "'"The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; . . . it does not lie in his mere expression of conclusion."  (Italics added.)  [Citation.]  In short, "Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions."  (Italics added.) [Citations.]'  [Citation.]"  (*People v. Lawley* (2002) 27 Cal.4th 102, 132.)

Although trial courts need not blindly accept expert evidence on the issue of competence, here the trial court implicitly rejected Dr. Plotkin's evidence that appellant remained incompetent—the only probative evidence in the record—without making any findings or citing any additional evidence that would support its ruling.  This was error. (See *In re R.V.* (May 18, 2015, No. S212346) __ Cal.4th __ [2015 WL 2343133, *25] [recognizing "the propriety of rejecting even unanimous expert opinion" where it suffered from "infirmities" such as, for example, "when . . . the experts were unfamiliar with the evidence that would tend to explain the defendant's behavior [citation], when the experts' opinions were based solely on a brief interview with the defendant [citation], and when the experts' opinions regarding the defendant's incompetency were tenuous"]; cf. *People v. Lewis* (2006) 39 Cal.4th 970, 1048, fn. 25 [court properly rejected expert opinion that

defendant was incompetent "after giving plausible reasons for doing so"]; *People v. Kaplan* (2007) 149 Cal.App.4th 372, 386 [competency hearing required where "[t]he record does not show that the trial court found [expert] report in any way unreliable"].) The error is particularly troubling in light of the fact that Dr. Plotkin was one of many mental health professionals to evaluate appellant over a three-year period, all of whom found him incompetent to stand trial.

We therefore conditionally reverse the trial court's judgment and order a limited remand "for the trial court to determine whether a retrospective competency hearing is feasible and, if so, to conduct such a hearing." (*People v. Lightsey* (2012) 54 Cal.4th 668, 706.) "If the trial court determines that conducting a retrospective competency hearing is not feasible, or if a retrospective competency hearing is held at which defendant proves he was incompetent by a preponderance of the evidence [citation], then the only permissible remedy would be to let stand our reversal, subject to defendant's being retried if he is at that time mentally competent to stand trial. If a fair and reliable retrospective competency hearing can be conducted, and at that hearing defendant fails to prove he was incompetent, the judgment will be reinstated." (*Id.* at pp. 709-710, fn. omitted.)

"In assessing whether a retrospective competency hearing is feasible, the trial court should consider "'''(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial"'''' [citation], as well as any other facts the court deems relevant. . . . [T]he focus of the feasibility determination must be on whether a retrospective competency hearing will provide defendant a *fair opportunity* to prove incompetence, not merely whether some evidence exists by which the trier of fact might reach a decision on the subject. . . . [T]he remedy provided must be 'procedurally adequate and substantively acceptable under the Due Process Clause.' [Citation.] Because of the inherent difficulties in attempting to look back to the

11

defendant's past mental state [citation], the burden of persuasion will be on the People to convince the trial court by a preponderance of the evidence that a retrospective competency hearing is feasible in this case. [Citations.]" (*People v. Lightsey*, *supra*, 54 Cal.4th at pp. 710-711.)

In addition, the trial court retains discretion to dismiss the charges pursuant to section 1385. (§ 1370, subd. (d); *In re Banks* (1979) 88 Cal.App.3d 864, 869, fn. 2 ["While the statute does not explicitly require dismissal when the incompetency commitment has expired and the accused has already been confined for a period equal to the maximum sentence for the charged offense, it would be a rare case in which dismissal would not be granted"].) The trial court also may wish to consider seeking a conservatorship for appellant. The Public Guardian refused to do so because, in its view, appellant's incompetency stemmed from an intellectual disability rather than a mental health disorder. Yet there are secured facilities for individuals who have a "developmental disability" and are a danger to themselves or others. (§ 1370.1, subd. (c)(2)(A); Welf. & Inst. Code, § 6500 et seq.) We note that Patton staff found both of these criteria to be true.

## DISPOSITION

The judgment is conditionally reversed and this matter remanded to the trial court with directions to (1) hold a retrospective competency hearing, if possible; (2) retry appellant, if he is currently competent; or (3) dismiss the charges. If appellant is found to have been competent on December 12, 2013, his conviction and sentence shall stand.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

12

Mark C. Kim, Judge

Superior Court County of Los Angeles

_____

California Appellate Project, Jonathan B. Steiner, Executive Director, Richard B. Lennon, Staff Attorney, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephen E. Mercer, Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.